CARTER, Judge.
This is a very unusual case wherein two-five gallon clear glass bottles of water belonging to the defendant-appellant, Kent-wood Spring Water, Inc. (Kentwood), allegedly caused a fire at a mobile home owned by the plaintiff-appellee’s insured.[1] Subrogated to the claims of its insured, plaintiff-appellee, State Farm General Insurance Company, filed this suit based on theories of negligence and strict liability. After a trial on the merits, the lower court awarded judgment in favor of the appel-lee.[2] Kentwood appeals the decision alleging three specifications of error which present only one issue for this court’s review: Was the evidence presented at trial sufficient to carry the plaintiff’s burden of proof? [3]
On February 2, 1981, a fire occurred at the mobile home of Richard and Louise Fortson in Houma, Louisiana. The evidence tends to suggest the fire started in the mid-afternoon, and there is no question but that the day was very bright, cool, and with little humidity. The Fortsons were not at home.
Pat Adams, a neighbor of the Fortsons discovered the fire while walking past the Fortson’s mobile home. Adams noticed what appeared to him to be “a cigarette burn and a little tiny smoke” on the outside of the trailer behind two five-gallon glass water jugs. The water jugs belonged to Kentwood and had been placed on the Fort-son’s front porch by the appellant’s deliveryman on January 23, 1981. Adams testified there was nothing between the sun and water jugs to prevent the sunlight from striking the glass jars; similarly there were no obstructions between the glass jugs and the outside wall of the mobile home.
*560 Rushing over to the trailer, Adams first checked to see if anyone was at home, then, after calling to a neighbor to summon the fire department, Adams checked the trailer a second time before spraying the outside wall of the trailer with water. A few minutes later the fire department arrived and extinguished the blaze.
An investigation into the origin of the fire began soon thereafter. The central question raised in the investigation, and the only issue contested at the trial, was the location of where the fire began. The ap-pellee contended the fire started as a result of the passage of a concentrated beam of sunlight through one or both of the water bottles. Appellee claimed the heat generated by the concentration of light caused the outside wall to begin burning.
The appellant denied this but had no explanation of its own. There was some argument that an electrical receptacle may have been the origin of the fire, but the evidence tending to prove this was unconvincing.
The trial judge found that the evidence proved more probably than not, “that the fire was caused by the alteration or concentration of sunlight as it passed through one or both of two glass bottles of Kentwood drinking water.” Additionally, he found that “the weight of the physical evidence and the testimony of those witnesses who either discovered the fire, fought the fire, or actually visited and inspected the mobile home leads to this conclusion.”
It is important to note that in his excellent written reasons for judgment, the trial judge made the following observations which are very helpful in addressing Kent-wood's argument on appeal,
The court notes that the plaintiffs expert witnesses inspected the mobile home either immediately after or shortly after the fire, whereas the defendant’s expert witnesses inspected the mobile home only after a substantially longer time period subsequent to the fire, after repairs had begun or were completed, or did not visit the mobile home at all.
This passage is, of course, a comment on the evidence presented at trial. It reflects a sincere attempt by the lower court to evaluate the credibility of the witnesses, and to come to some factual conclusions as to the origin of the fire.
Thus, based upon the testimony and evidence presented at the trial, the lower court came to the factual conclusion that the fire was precipitated by the heating-up of the outside wall of the trailer because of the passage of sunlight through one or both of the Kentwood bottles. The trial judge’s evaluation of the credibility of the witnesses, together with his conclusions with respect to the efficacy of the tests run, and observations made, by the various expert and lay witnesses, led him to conclude that the appellee had carried its burden of proof. Our close review of the record and the evidence presented at trial convinces us of the correctness of the trial judge’s studied opinion. His factual conclusions (and evaluations of credibility) find ample support in the record and do not represent an abuse of discretion. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973). It is well settled that the reviewing court must give great weight to the factual conclusions of the trier of fact, and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed. The trial judge was satisfied with the sufficiency of the evidence establishing the sunlight and Kentwood bottles as the source of the fire. We cannot say he was clearly wrong. Baach v. Clark, 442 So.2d 514 (La.App. 5th Cir.1983); Pearce v. Rogers, 423 So.2d 83 (La.App. 1st Cir.1982).
Indeed, the evidence presented at trial clearly weighs in appellee’s favor. In addition to the testimony of Pat Adams, Louise Fortson testified that no electrical appliances were plugged into any receptacles which may have been located opposite the area found burning by Adams. Of even more importance to the trial judge was the testimony of Thomas Guidry, assistant chief of the fire department responding to *561 the fire and the only expert who actually observed the fire burning. Guidry first suspected the fire was electrical in origin, but on more detailed analysis changed his mind. Three factors convinced Guidry the fire was caused by the concentration of sunlight passing through the bottles: First, Guidry’s investigation into the fire led him to several houses where the walls had been scorched by sunlight passing through other Kentwood bottles. Photographs of these scorched walls clearly show burn marks on the outside. Second, a 2" X 4" wooden stud centered perfectly behind the hole on the outside wall was burned significantly more on the outside than on the inside. This was true even though Pat Adams extinguished the blaze on the outside much sooner than the fire department extinguished the blaze on the inside. This convinced Chief Guidry that the fire burned longer and/or hotter on the outside portion of the 2" x 4" stud than on the inside. Finally, Guidry, testified that the fire did not have enough of a “v” pattern to indicate a receptacle fire.
Appellee also presented the testimony of Harold Myers, an engineer with expertise in the field of fire and explosion investigation. Myers made several points which apparently influenced the trial judge. First, he agrees with Guidry that the burn pattern of the fire did not suggest its point of origin was a receptacle. Second, from his review of the fire scene he questioned whether there was any receptacle or electric wire in the area of the fire at' all. Third, and once again in agreement with Guidry, Myers noted the heavy burning on the outside but not the inside of the wooden stud, and he further suggested that the geometric configuration of the hole in the outside wall indicated the fire started on the outside. Myers noted that the configuration of the burn followed exactly the arc made by the sun at that time of day.
Additionally, Myers made two further points of interest. First, using one of the bottles found at the scene of the fire, and simulating conditions as on the day of the fire as best he could, Myers was able to scorch some cardboard in a short period of time. Myers noted that once a wood or wood type product is scorched, very little supplemental heat is necessary to flame it. The outside wall of the Fortson’s mobile home was made of Masonite, a wood derived product. Second, Myers testified that after a wood or wood-type product has been subjected to numerous periods of heating, its kindling temperature decreases. Thus, because the Masonite was heated and re-heated every time the sun passed through the bottles, (for the 11 days the bottles remained on the porch) the temperature required to flame the wall was significantly lowered. In sum, Myers was quite confident the concentration of sunlight theory was the correct one.
Of particular significance was the testimony of M.A. Roohi, Vice-President and General Manager of Kentwood. Called on direct-examination by the appellant, Roohi was asked:
Q. Mr. Roohi, in the course of your experience in the bottle water industry ... have you ever heard of this [a fire caused by the passage of sunlight through glass bottles] occurring before?
A. Not at all. Not in the five gallon bottles....
Q. Now, you said with respect to the five gallon bottles?
A. That’s correct.
Q. Were you ever aware of any other incident with any other containers where it might have scorched something?
A. That’s correct. In a small one gallon container used to be used ... I experienced when I was running the plant that we were using wooden cases and I saw many scorches on the wooden cases....
On cross-examination this line of questioning was expanded upon by appellee’s trial attorney:
Q. Now, tell me about the scorching of the wood that you observed with theone (sic) gallon bottles? Where was this?
*562 A. Sitting in our yard over the weekend. ...
Q. And you observed this on a number of occasions?
A. That’s correct. I observed that on a number of occasions, and at times I would cover them.
Q. You would cover them?
A. With a cardboard box or something.
Q. And that would be to keep the sunlight off so they wouldn’t damage the crates.
A. That is correct_
Q. So when was it you saw this scorching of the wooden crates?
A. I guess I notice (sic) it during the time that I was plant manager. When it was directly my responsibility, I observed that.
Q. That was before the fire in this case?
A. Oh, yes.
Q. This scorching that we are talking about, you could actually see the wood blackened and charred?
A. That’s right.
Q. And it was significant enough for you to cover these crates to try to keep the sun off of them?
A. That’s correct.
In defense of appellee’s action Kentwood presented several witnesses. The most significant testimony was elicited from two experts, Dr. Robert Morris, a physics professor at Tulane University, and Mr. George Pappas, a chemical engineer. With respect to the testimony of these witnesses, it should be pointed out that neither expert had an explanation for the cause of the relatively simple fire. The testimony of Morris and Pappas was limited to refuting the concentration-of-sunlight theory as an explanation, and apart from an almost offhanded assertion that the fire was probably electrical in origin, these witnesses provided very little aid to the court in its search for the origin of the blaze.
The testimony of Dr. Morris consisted almost wholly in an explanation of various tests he conducted in an attempt to determine, if the passage of sunlight through one or both of the bottles could have generated sufficient heat to catch the Masonite on fire. Basically, the tests run by Dr. Morris were quite simple. Placing a Kentwood bottle filled with water between the sun and various wooden objects, including Masonite, Dr. Morris would attempt to measure the temperature of the sunlight passing through the glass bottles and striking the wood-type product.
Dr. Morris ran two series of test. In the first series, Morris testified that he was able to generate a temperature of 200° Fahrenheit (F), then later 270° F. On cross-examination, Morris was questioned about a report he wrote explaining the import of this first series of test:
Q. Now, you wrote a report as a result of the first series of test, is that correct?
A. Yes.
Q. And I am referring to a report dated January 7, 1982 in which you state “More precise temperature estimates would necessitate further work including other measuring techniques. However, based on the present work, I would conlucde that it is indeed possible that Kentwood glass bottles filled with water could have generated temperatures high enough to have triggered the fire. Needless to say, there are many variables, such as height of sun, direction of sun with respect to bottle, type of material under and behind bottle and weather conditions which are very important. But I have demonstrated that the proper combination of these factors along with the Kentwood clear glass bottle filled with water, can start a fire.”
A. That’s correct.
Q. And you agree with that?
A. Yes. I started a fire with a dry leaf.
Q. As a matter of fact, you went further and made a recommendation to Kentwood, did you not?
*563 A. Yes.
Q. You said in that report, “I would recommend that Kentwood discontinue the use of clear glass bottles in direct sunlight, if indeed they are still using them.”
A. Yes.
Q. If a different glass bottle should be used in the future, it should be either tinted so as to absorb some of the light or have a roughened surface, frosted or ground, so as to difuse (sic) light. The unrestrained focusing capability of the bottle is to be avoided? (sic)
A. That’s correct. And I stand by that. The second series of test resulted in the measurement of the same temperature as the first — 270° F. In Dr. Morris’ opinion this was the maximum temperature that could be generated by passing sunlight through the bottles. Further tests by Dr. Morris later revealed that the flame temperature of the Masonite was, allegedly, around 730° F. Thus, it was Morris’ position that sunlight passing through the bottles simply could not have flamed the Masonite.
On cross-examination the appellee’s attorney brought to light several discrepancies and weaknesses in Morris’ testimony. First was the letter noted above. Second, Dr. Morris admitted that some of the original measurements were significantly off the mark and therefore subject to question. Furthermore, Morris conceded that he did not know whether the Masonite he tested (which allegedly came off the Fortson’s trailer) was in the same condition as at the time of the fire, and he admitted that it would be impossible to exactly simulate conditions as they existed on the day of the fire.
In the final analysis, while we note that Dr. Morris had impressive credentials and conducted his tests with sincerity, we agree with the trial judge that there existed too many discrepancies in his testimony to convince the court that Dr. Morris had the definitive answer to the question of whether the sunlight and bottles could have instigated the fire. The trial judge made a reasonable evaluation of credibility in discounting Morris’ testimony and we see no abuse in his decision. Arceneaux, 365 So.2d at 1333.
Appellant’s second expert was Mr. Pap-pas. Mr. Pappas, like Dr. Morris, felt that it would have been impossible for the sunlight and bottles to have started the fire on the outside of the trailer. Pappas supposed the fire to have been electrical in origin, yet it is curious that Pappas simply could not give a credible accounting of how an electrical fire could have resulted in the various burn patterns noted in the trailer. On cross-examination and rebuttal, appel-lee’s attorney pointed out other weaknesses in Pappas' testimony which the court need not particularize here.
Quite illustrative of the expertise with which the trial judge handled this case is his observations regarding a test heavily relied upon by appellant. At one point Mr. Pappas used a blow torch to attempt to burn through some Masonite. Although he succeeded, the length of time it took to burn through the materials (five minutes at a temperature of approximately 2000° F.) suggested that the relatively low temperatures capable of being generated by the concentration of sunlight simply could not have ignited the Masonite. As regards this test the trial judge noted:
“I think that Mr. Pappas’ theory that the fire started from the inside out because of the blowtorch test he did can be challenged because of the fact that the blowtorch test would not produce the same effects that a magnifying lens would and the fact that he simply used a sheet of the material, whereas in the actual conditions it was boxed in and closed in from the back, which I am certain is a variable that could change the results.”
This observation by the trial judge can serve as an illustration of the weaknesses in appellant’s evidence throughout the trial. The tests run by the appellant’s experts simply could not properly account for all of the factors which existed on the day of the *564 fire. Scientific facts are always subject to the protocol and simulation problems and, like the trial judge, we find such problems in this case: Perhaps this is one reason why the appellant’s experts were diffident when positing an explanation for the cause of the blaze. Simply put, the tests run by Morris and Pappas were unpersuasive in light of the more relevant and clearer explanation for the fire suggested by the testimony and exhibits of the appellee. In short, we find that the appellee proved by a preponderance of the evidence that the fire started on the outside of the trailer as a result of the passage of a concentrated beam of sunlight through one or both of the Kentwood water bottles. The decision of the lower court is supported by the clear weight of the evidence and will not be disturbed on appeal. Baach, 442 So.2d at 518; Pearce, 423 So.2d at 87.
For these reasons, we affirm the decision of the lower court in all respects at appellant’s costs.
AFFIRMED.

. After the fire, State Farm General Insurance Company paid the claim of its insured. By the terms of the policy issued by State Farm it became subrogated to the insured’s rights to the extent of the policy.

. Damages were stipulated.

.Another party involved in the case was dismissed. Neither appellant nor appellee has raised this dismissal as an error at the appellate level.